IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JESSICA L. DAVIS                                                         PLAINTIFF


            v.                    CIVIL NO.        2:10-CV-02064-JRM


MICHAEL J. ASTRUE, Commissioner
of Social Security Administration                                       DEFENDANT

**<u>MEMORANDUM OPINION</u>**

Plaintiff brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision

of the Commissioner of Social Security Administration (Commissioner) denying her claim for a

period of disability and disability insurance benefits (DIB) under Title II of the Social Security

Act (Act), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's decision.

*See* 42 U.S.C. § 405(g).


**I.      <u>Procedural Background</u>:**

Plaintiff filed her current applications for disability insurance benefits (DIB) and

supplemental security income (SSI) payments on October 20, 2005, alleging disability since

January 1, 2004, due to panic and anxiety attacks (Tr. 53, 94, 99, 111). The Agency denied her

applications initially and on reconsideration (Tr. 63, 66, 73, 75). Pursuant to Plaintiff's request,

an ALJ held a de novo hearing on January 23, 2008, at which Plaintiff, represented by counsel,

Plaintiff's mother, and a vocational expert, testified (Tr. 6-41).  The ALJ denied that Plaintiff's

claim and the Plaintiff filed the current Complaint (ECF No. 1) on May 11, 2010.

II.    **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id.* "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If the court finds it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, the court must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)©. A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.    Applicable Facts

Plaintiff was 18 years old at the time of her alleged onset date of January 1, 2004. (Tr. 60). She has a tenth grade education, and has work experience as a cashier (Tr. 7, 112, 117). Plaintiff testified that she stopped working full-time in 2005 because of her anxiety and panic attacks (Tr. 12) which started in 1998 or 1999 (Tr. 13).

On September 23, 1999, Dr. Baker saw Plaintiff, and he indicated that she had been on Zoloft[1] for about a year and was feeling much better but still having a lot of stress along with palpitations. He noted that her heart rate and rhythm were regular.  He advised that she

---

[1]ZOLOFT is used to treat in adults Major Depressive Disorder (MDD), Obsessive-Compulsive Disorder (OCD), Panic Disorder, Posttraumatic Stress Disorder (PTSD), Premenstrual Dysphoric Disorder (PMDD), and Social Anxiety Disorder. It is also approved to treat Obsessive-Compulsive Disorder (OCD) in children and adolescents aged 6-17 years.   See www.zoloft.com

could increase her to increase her dosage of Zoloft to 75mg or even 100 mg. (T. 31).

On November 22, 1999 the Plaintiff again saw Dr. Baker for headache and dizziness and palpations.  He noted that the heart rate and rhythm were regular. (T. 316).

On February 23, 2000 the Plaintiff saw Dr. Baker for a runny nose, sore throat and nausea.  She also stated she had some dizziness and heart pounding.  He noted that her heart rate and rhythm were regular. (T. 315).  On April 6, 2000 Dr. Roberts noted that the Plaintiff was quite depressed and that Zoloft initially helped but he could not get her to take a higher dose.  He referred her to Dr. Chambers. (T. 314).

On June 21, 2000 it appears that the Plaintiff began to treat with Dr. Donald Chambers. (T. 302). On August 17, 2000 it appear that Dr. Chambers changed the Plaintiff's prescription to Celexa. [2](T. 301). On September 18, 2000 Dr. Chamber noted that Celexa helped and Plaintiff was not having anxiety attacks. (T. 301)

On January 8, 2001 the Plaintiff again presented to Dr. Baker with various complaints. Dr. Baker noted that the heart rate and rhythm were regular, lungs were clear. (T. 312).

On January 15, 2001 Dr. Chamber's noted that Celexa was helping and was better than the Zoloft. (T. 301).

On January 26, 2001 the Plaintiff again presented with "some vague complaints" but Dr. Baker noted that her heart rate and rhythm were regular and lungs were clear and she was in no acute distress. (T. 311).  On April 3, 2001 Dr. Baker also noted that her heart rate and rhythm were regular and lungs were clear. (T. 310).

---

[2]Celexa is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). See www.drugs.com.

On March 1, 2001 Dr. Chambers noted that the mother did not like the Plaintiff on the medication because she had gone out and got a piercing.  Dr. Chambers noted that "Her mother feels she is having some personality changes she does not like on the Celexa...It seems that these have to do with her standing up to her mother and being a little appositional."  The Plaintiff acknowledged that her anxiety was less and her mood and spirits were better.  The Plaintiff felt her mother was controlling. On June 1, 2001 it appears the Plaintiff ran up a $1,500 phone bill on her mother's phone. (T. 300).  On June the 12, 2001 Dr. Chambers noted the problem with the phone occurred because the Plaintiff was meeting people on the internet.  He then stated that he was "going to let the mother stop the Celexa.  She (mother) has become more of a problem on it. I don't think there is anything manic here.  I think she (Plaintiff) is just more assertive. (T. 299).

By November 26, 2001 it appears that the Plaintiff had returned to taking her Celexa 20 Mg per day. (T. 298).  The Plaintiff had an appointment with Dr. Chambers on May 24, 2002 but failed to show. (Id.).

On December 2, 2002 Dr. Baker noted that the Plaintiff was having increased anxiety attacks and that he had increase her Celexa from 10mg to 20mg without effect. He also noted that her heart rate and rhythm were regular and lungs were clear. (T. 309).

On March 31, 2003 Plaintiff saw Dr. Baker and stated that she had "been trying to taper off Effexor, as her family thinks it's making her abusive and hard to deal with."  Dr. Baker noted that the Plaintiff had been that way "since we have know her" and that Effexor had been helping her quite a lot and he believed that tapering off of the drug was a bad idea..  He also noted that her heart rate and rhythm were regular and lungs were clear.  (T. 308).

On April 16, 2003 she agin saw Dr. Baker who noted that her heart rate and rhythm were

regular and lungs were clear. (T. 307).  On June 3, 2003 she saw Dr. Baker for a follow-up on

depression.  He noted that the Plaintiff's mother decided she needed to go off the Effexor and she

did. Dr. Baker gave the Plaintiff some samples of Paxil-CR 12.5mg.[3]  (T. 306).

On December 3, 2003 Plaintiff saw Dr. Baker complaining of anxiety attacks one to two

times per week causing her to miss work. Plaintiff acknowledged that the Paxil was helping

initially.  Dr. Baker increased her dosage to 25mg a day. (T. 304).

She was treated for pain at the emergency room of Crawford Memorial Hospital on

October 2, 2004. It was described as "back pain" in the clinical impression (T.253) described as

"flank pain" in the lab report. (T. 255).  It appears that the Plaintiff was discharged home on the

same day without any treatment or prescription. (T. 253). T

On November 16, 2004, Ms. Davis complained of back pain to Dr. Baker but no

treatment or prescriptions were ordered. (T. 167).  The Plaintiff did receive a sample pack of

Respi-TANN which is a decongestant that shrinks blood vessels in the nasal passages and a

sample pack of Ketek, an antibiotic.

On October 20, 2005 the Plaintiff filed for disability alleging an onset date of January 4,

2004.

On November 30, 2005 a Mental Status and Evaluation of Adaptive Functioning was

performed by Douglas A. Brown, Ph.D.  (T. 248-250).

On February 22, 2006 a RFC assessment was performed by Jay Rankin. (T. 268-285).

On January 4, 2007 the Plaintiff underwent a Mental Status Diagnostic Evaluation by

---

[3] Paxil CR controlled-release tablets are used for treating depression, panic disorder, or
social anxiety disorder. See www.drugs.com.

Kathleen M. Kralik, Ph. D. (T. 286-293) which was reviewed by Jerry R. Henderson on January 18, 2007. (T. 294).

IV.   **Discussion**:

At step two of the sequential evaluation process, the ALJ is to determine whether a claimant's impairments are severe. 20 C.F.R. §404.l520©. To be severe, an impairment only needs to have more than a minimal effect on a claimant's ability to perform work-related activities. Social Security Ruling 96-3p. The Regulations, Section 404.1510 but in order to establish that a medically determinable physical or mental impairment) is present there should be evidence that medically discernible anatomical, physiological, biochemical or psychological aberrations exist. See 404.1501(a) or (b)(1)

At step two of the sequential evaluation process, the ALJ determined that Plaintiff had the following severe impairments: anxiety attacks and depression (Tr. 55, Finding No. 3) but determined that the Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 56, Finding No. 4).

Plaintiff alleges that the ALJ erred in making this finding. See Plaintiff's Brief (Pl.'s Br. at 10-13.) Plaintiff argues that the ALJ should have determined that her personality disorder, attention deficit hyperactivity disorder (ADHD), and parent-child relational problems were severe impairments *See* Pl.'s Br., p. 11. These diagnoses come from Dr. Kathleen M. Kralik based upon a one time consultive examination on January 4, 2007. (T. 286-293) The results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision. *See, e.g., Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir.1999)

(stating that the opinion of a consultative physician does not generally satisfy the substantial evidence requirement).  Regardless, Dr. Kralik was of the opinion that the Plaintiff was able to work. (T. 292).

There is no objective evidence to support a finding that her alleged additional mental impairments caused more than a slight abnormality to do basic work activities. *See Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (an impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical and mental ability to do basic work activities); see also *Brown v. Shalala*, 15 F.3d 97, 99-100 (8th Cir. 1994) (plaintiff failed to provide "medically acceptable" evidence to support claim of an environmental impairment).

The Plaintiff also contended the ALJ erred concerning his failure to evaluate her physical limitations. (See Pl. Br., p. 12). Substantial evidence supports the ALJ's determination that Plaintiff's back pain was not severe (Tr. 56). The ALJ properly determined that Plaintiff's back pain did not meet the criteria of step two because the record did not include objective evidence such as magnetic resonance imaging (MRI) scans, x-ray examinations, or other laboratory testing to support Plaintiff's complaints of severe back pain (Tr. 56). The Plaintiff testified at the administrative hearing that the last time she sought medical treatment for her back pain was in 1999, nine years before the hearing, and over four years before her alleged disability onset (Tr. 18-19). The record does show that the Plaintiff was treated for pain at the emergency room of Crawford Memorial Hospital on October 2, 2004. It was described as "back pain" in the clinical impression (T.253) but described as "flank pain" in the lab report. (T. 255).  It appears that the Plaintiff was discharged home on the same day without any treatment or prescription. (T. 253).

-8-

On November 16, 2004, Plaintiff complained of back pain to Dr. Baker but no treatment or prescriptions were ordered. (T. 167).  The Plaintiff did receive a sample pack of Respi-TANN which is a decongestant that shrinks blood vessels in the nasal passages and a sample pack of Ketek, an antibiotic.

The Plaintiff admitted that she had not been taking medication for her back pain (Tr. 19). The failure to request pain medication is an appropriate consideration when assessing the credibility of a claimant's complaints of pain. *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir.1994). The court also notes that the Plaintiff failed to list back pant in her initial application for disability(T. 111) but did list her back problems on the Disability Report filed July 3, 2006. (T. 133). Plaintiff's back pain was not a severe impairment.

Also, Plaintiff did not allege her stomach problems, headaches, or obesity as impairments in her disability application, or at the administrative hearing (Tr. 6-27, 111). See Pl.'s Br. at 12-13. The fact that the plaintiff did not allege stomach problems, headaches, or obesity  as a basis for her disability in her application for disability benefits is significant, even if the evidence of such problems was later developed. See *Smith v. Shalala*, 987 F.2d 1371, 1375 (8th Cir.1993); *Dunahoo v. Apfel*, 241, F. 3d 1033, 1039 (8th Cir. 2001). Regarding Plaintiff's headaches, all of the objective tests in the record concerning Plaintiff's head showed normal results (Tr. 220, 229-230).

Social Security Ruling ("SSR") 00-3p, which states that obesity is a "medically determinable impairment" that can constitute a severe impairment under Listing 12.05C, and reminds adjudicators "to consider [obesity's] effects when evaluating disability." SSR 00-3p, 65 Fed. Reg. 31,039, 2000 WL 33952015 (May 15, 2000).  While obesity can impose a significant

work-related limitation, substantial evidence supports the ALJ's rejection of Plaintiff's claim.

Nothing in Plaintiff's medical records indicates that a physician ever placed physical limitations

on Plaintiff's ability to perform work-related functions because of her obesity. *See Forte v.*

*Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004)

**RFC:**

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional

levels but with the following non-exertional limitations: Plaintiff was moderately limited in her

ability to understand, remember, and carry out complex instructions; respond appropriately to

usual work situations and routine work changes; and interact appropriately with supervisors, the

public, and coworkers (Tr. 57, Finding No. 5).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §

404.1545(a)(1).  It is assessed using all relevant evidence in the record.  *Id.*  This includes

medical records, observations of treating physicians and others, and the claimant's own

descriptions of her limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005);

*Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from

symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The

United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual

functional capacity is a medical question."  *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).

Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical

evidence that addresses the claimant's ability to function in the workplace."  *Lewis v. Barnhart,*

353 F.3d 642, 646 (8th Cir. 2003).

There is no evidence of any cognitive dysfunction. An x-ray examination and CT scan of

Plaintiff's skull, which showed no significant abnormality (Tr. 229-30). The MRI scan of

Plaintiff's brain dated April 2003, showed negative results (Tr. 220).

The record shows that Plaintiff visited Robert Baker, D.O., her treating physician, on

April 6, 2000, with complaints of nausea and abdominal pain (Tr. 210). Dr. Baker noted that

Plaintiff had depression and had been taking Zoloft (Tr. 210). He referred Plaintiff to Donald S.

Chambers M.D., for treatment of her depression (Tr. 210). On March 12, 2001, Dr. Chambers

noted that Plaintiff had been taking Celexa, and Plaintiff reported that her anxiety lessened, her

mood and spirit were better, and she was less dependant on her mother (Tr. 300). Thus, Dr.

Chambers continued her medication (Tr. 300). On June 12, 2001, Dr. Chambers agreed to

cessation of the Celexa treatment noting that he was doing so at the insistence of Plaintiff's

mother, who did not like Plaintiff's behavioral changes resulting from the medication (Tr. 299).

The ALJ noted that the Plaintiff testified that she was not taking any medication for her anxiety

at the time of the hearing. (T. 59).

On March 31, 2003, Plaintiff visited Dr. Baker complaining of anxiety and headaches

(Tr. 182). Dr. Baker noted that Plaintiff's mother was pressing her to taper off her medication,

Effexor, as it had been making her abusive and hard to deal with (Tr. 182). Dr. Baker noted that

Effexor had been helping Plaintiff a lot, and he stated that stopping her medication was probably

a bad idea (Tr. 182). However, at the family's insistence, he decided to reduce Plaintiff's dosage

(Tr. 182).

Impairments that can be controlled effectively with medication are not disabling for the

purpose of determining eligibility for SSI benefits. *See, e.g., Brown v. Barnhart*, 390 F.3d 535,

540 (8th Cir.2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir.1987); see also *Odle v. Heckler*,

707 F.2d 439, 440 (9th Cir.1983) (affirming a denial of benefits and noting that the claimant's impairments were responsive to medication). *Warre v. Commissioner of Social Sec. Admin.* 439 F.3d 1001, 1006 (C.A.9 (Or.),2006)

The Plaintiff had an appointment with Dr. Chambers on May 24, 2002 but failed to show. (Id.). It does not appear that she sought further treatment for her anxiety or depression.. In general, the failure to obtain follow-up treatment indicates that a person's condition may not be disabling or may not be as serious as alleged. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir.1995) (holding "[g]iven his alleged pain, Shannon's failure to seek medical treatment may be inconsistent with a finding of disability")

The ALJ has a duty to fully and fairly develop the record.  *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). The ALJ is not required to act as Plaintiff's counsel. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994) (ALJ not required to function as claimant's substitute counsel, but only to develop a reasonably complete record); *see also Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) ("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").  In this instance the ALJ has fully complied with his responsibilities to develop the record.

On November 30, 2005, Douglas A. Brown, Ph.D., a clinical neuropsychologist, examined Plaintiff and completed a "Mental Status and Evaluation of Adaptive Functioning" form (Tr. 248-50). Dr. Brown noted that Plaintiff's complaints included anxiety, panic attacks, headaches, and back problems (Tr. 248). He also suspected that Plaintiff's obesity contributed to her back problems (Tr. 248). He noted that Plaintiff had no history of hospitalization, and that

she underwent outpatient treatment with Dr. Chambers about three years before the examination (Tr. 248). Dr. Brown diagnosed Plaintiff with panic disorder, moderate, with agoraphobia; moderate depressive disorder; and morbid obesity (Tr. 249). He was able to understand Plaintiff, and noted that Plaintiff lived with her parents and did not get along with her father who had an alcohol-abuse problem (Tr. 250). He also noted that Plaintiff could bathe, dress, and feed herself; shopped with her mother; and could manage her own finances (Tr. 250). Her chores included laundry, and feeding and watering the animals (Tr. 250). Also, Plaintiff was able to maintain her concentration (Tr. 250).

Dr. Brown's report is the first instance that Obesity is mentioned in the record.  While obesity can impose a significant work-related limitation, substantial evidence supports the ALJ's rejection of Plaintiff's claim. Nothing in Plaintiff's medical records indicates that a physician ever placed physical limitations on her ability to perform work-related functions because of her obesity. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004).  Plaintiff never alleged any limitation in function as a result of her obesity in her application for benefits or during the hearing. Accordingly, this claim was waived from being raised on appeal. *See Pena v. Chater,* 76 F.3d 906, 909 (8th Cir.1996) (noting that the ALJ is under no " 'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability' ") (quoting *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir.1993)).

On February 22, 2006, Jay Rankin, M.D., completed a "Mental Residual Functional Capacity Assessment" form (Tr. 282-85). He found the Plaintiff's Restrictions of Activities of Daily Living were Mildly limited; Difficulties in Maintaining Social Functioning and Concentration, Persistence or Pace were Moderately limited and that there were no Episodes of

-13-

Decompensation. (T. 278). He also found that Plaintiff had no significant limitation in her ability to remember locations and work-like procedures; remember very short and simple instructions; remember detailed instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially-appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precaution; and to travel in unfamiliar places or use public transportation (Tr. 284). Also, Plaintiff had moderate limitation in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others (Tr. 284). He opined that Plaintiff could perform work where interpersonal contact was incidental to the work performed; complexity of tasks was learned and performed by route, few variables, little judgment; and the level of supervision required was simple, direct, and concrete (Tr. 284). The ALJ noted that Dr. Rankin determined that the Plaintiff was able "to perform unskilled work which required minimal interpersonal interaction." (T. 60).

On January 4, 2007 Kathleen Kralik performed a Mental Status Diagnostic Evaluation on the Plaintiff.  She was "fully oriented to person, place, ad purpose ; and was in touch with

-14-

reality" (T. 289) no cognitive issues were evident and she appeared more discourage and stressed

than depressed. ((287).  Her impairments of daily adaptive functioning was somewhat impaired

(T. 290); Communication and Social Skills were adequate but her emotional and cognitive

functionality and coping were problematic. (T. 291).  Dr. Kralick diagnosed the Plaintiff with

Anxiety Disorder NOS, Parent-Child Problems with sever impact, Attention Deficit Disorder,

Personality Disorder and placed her GAF at 41-50[4] although she estimated that her highest GAF

in the last year was 51-60[5].  Dr. Kralik stated however that the Plaintiff was "able to work; but as

noted, she has not tended to select occupational circumstances more suitable to her actual

circumstances and needs; and her environment has not required that she persist (and in fact seems

to reinforce not persisting and dependency over independence)." (T. 292)

The ALJ found that based upon the medical evidence and the testimony of a VE there did

exist work in the national and local economy jobs that the Plaintiff could perform and that she

was not therefor disabled.

## V.    Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial

evidence supporting the ALJ's decision, and thus the decision should be affirmed.  The

undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

Dated  this 4th day of April 2011.

---

[4]A GAF of 41 to 50 indicates "Serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e .g., few friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed.2000).

[5]A GAF score of 51 to 60 indicates "moderate symptoms ... OR moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

/s/ J. Marschewski
HONORABLE JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE